No. 2489.

## JAMES WOODSON v. THE STATE.

1. PRACTICE—CHANGE OF VENUE—CASE APPROVED—CASE STATED.— Upon his arraignment in the criminal district court of Harris county, in which court the indictment was presented, the accused filed his statutory application for a change of venue, which the trial court awarded, and ordered the venue changed to Galveston county. The accused objected that the venue should have been changed to the district court of Fort Bend county, as the nearest to Harris county, and upon arraignment in the criminal district court of Galveston county he pleaded to the jurisdiction of said court. *Held*, that the objection was futile, and the plea to the jurisdiction was properly overruled. Note the opinion for the approval of the ruling in Bohannon's case, 14 Texas Court of Appeals, 271, to the effect that the discretion confided to district judges to change the venue of their own motion to another county within or beyond their own judicial districts is a judicial and not a personal discretion, but one that will not be revised unless it was abused to the prejudice of the accused.

2. FALSE SWEARING—EVIDENCE.—The general rule is that the best evidence by which a fact can be proved, must be produced or its absence be accounted for before secondary evidence can be resorted to. But an exception to this rule is that the official character of an alleged public officer need not be proved by the commission or other written evidence of the officer's right to act as such, except in an issue directly between the officer and the public. The trial court did not err in permitting a State's witness to testify that he was the justice of the peace who administered the oath upon which the false swearing was predicated.

3. SAME.—BILLS OF EXCEPTION reserved to the action of the trial court excluding testimony will not be considered by this court unless they disclose the relevancy and materiality of the excluded evidence.

4. SAME.—THE CHARGE OF THE COURT in this case was deficient in failing to instruct the jury as to the legal meaning of the terms "willful" and "deliberately," but, inasmuch as no exception was reserved to the

omission, and it was practically supplied by a special instruction given to the jury, the omission is *held* to have been without prejudice to the accused, and the charge sufficient in substance.

APPEAL from the Criminal District Court of Galveston.  Tried below before the Hon. Gustav Cook.

The conviction in this case was for false swearing, and the penalty assessed against the appellant was a term of two years in the penitentiary.

A. R. Railey was the first witness for the State.  He testified that, on the twenty-ninth day of March, 1886, he was a duly elected, qualified and acting justice of the peace, in and for Harris county, Texas.  On that day the defendant sent word to the witness to call upon him and swear him to an affidavit.  Witness waited upon the defendant, who presented an affidavit, with certificate attached, and witness administered to him the oath, wherein he declared the truth of the matters set forth in the affidavit.  Defendant then signed' the affidavit, and witness attached his jurat to it.  Witness did not read the affidavit.  He could only fix the date of his transaction by the date of the jurat, which was March 29, 1886.

W. R. Baker testified, for the State, in substance, that he was one of the contestants for the office of mayor of the city of Houston, Harris county, Texas, in the municipal election of 1886.  On the night of March 23, in that year, the witness, with Judge Brashear, now deceased, Ed Jemison, Henry Love, John Spriggins, Wyat Davis, John Bentley and Tom Harris, the last six mentioned parties being colored, went to the "So-so" saloon, kept by a colored man, in the western part of the city.  Their purpose in going to the said saloon was to attend a political meeting in progress there.  After leaving that saloon, the witness and the parties named started to another meeting in another part of the city, on the opposite side of the bayou from the "So-so" saloon.  Upon reaching a point between fifty and a hundred yards south of the Sabine street bridge, the witness observed a man on horseback, standing on the opposite side of the street, in the shade of a tree.  That man called to the crowd and asked if "Mr. Baker" was in it.  Witness replied in the affirmative, and the man said: "Step this way; I want to see you."  Witness went to the horseman and stood by him, with one hand on the horse's neck.  Witness took that man to be a full whiskered white man.  Witness asked what was wanted,

and the man replied that he was supporting Smith for mayor, and wanted the witness to withdraw from the race. The witness declined, with the remark to the man: "You must be joking." Thereupon the horseman opened fire upon the witness, firing three shots at him. Upon the firing of the first shot, the witness stepped backwards, and, his foot striking a rut, he fell to his knees and his beaver hat fell from his head. The horseman then fled rapidly across the bridge, followed by several shots fired by the witness's companions. The witness's assailant was riding a gray horse about fifteen hands high. Milton Baker and Ed Williams were neither with witness's party on that occasion. No one in witness's party called out: "Milton, let's play that trick;" nor: "Hold it up, Milton." No one said: "Hold it up higher, Milton." No one took the witness's hat from his head on that night, nor was the hat of any one of the party removed by any other member of the party. No one cried: "Boys, you are not playing it right." No one said: "Some Smith man is trying to kill old man Baker." The assault described by witness occurred about nine o'clock p. m., on March 23, 1886, in Houston, Harris county, Texas.

Cross examined, the witness said that he offered a reward of one thousand dollars for the apprehension of his would-be assassin, and employed detective Hennessey to attempt the discovery of the man who assaulted witness. Witness did not make an affidavit against defendant, nor did he know that Hennessey made one. The witness was running for mayor of Houston as an independent candidate, against Mr. Smith, the nominee of the Democratic party, and his business at the "So-so" saloon was to solicit votes. The election occurred on April 5, 1886. Between the twenty-ninth day of March, the date of defendant's affidavit, and election day, some one made an affidavit against the defend-ant for false swearing, and he was taken before the justice of the peace for preliminary examination. The witness was served with a subpœna *duces tecum* to appear before that tribunal, and to produce the hat he wore on the occasion of the assault upon him. Witness did not produce the hat on that trial, and was unable to produce it on this trial. The witness stated in this connection that he had no family, and in March, 1886, was living alone, save his servants. His old negro cook took the hat into the kitchen, where she kept it on exhibition for seven or eight days. It disappeared in some way, and witness had not seen it since. Several persons, of whom, however, witness could now

name only Mr. Terry Smith, saw the hat on the night of and after the assault. The said Smith was the first person to discover that the hat received a shot during the assault. Witness himself did not observe it until Smith called his attention to the hole. No white person, that witness could now remember, asked to or did see the hat, on or after the day following the assault.

Continuing, the witness stated that, after the assault, he and his party continued their journey to the Benevolent Hall, where another meeting was in progress. En route they met William Glass, who, mounted, was going toward the bridge to ascertain the cause of the shooting. They told Glass of the shooting, and Glass went with them to the Benevolent Hall. When the hall was reached, the witness secured a seat near the stage from which Marshall Tankersly was then speaking. As witness sat down he took off his hat, and Terry Smith called his attention to the bullet hole in the front of the hat, just above the band. The ball on its exit made a rent in the hat large enough to admit a man's finger. At that place the hat was slightly powder burned. Neither the witness's face nor his hair was burned. After Smith, some other parties examined the hat, and soon afterward, the meeting breaking up, the witness, with several parties, went to the Capitol Hotel. The would-be assassin was never apprehended. Witness saw Milton Baker on the street car after the meeting at the Benevolent Hall broke up. No laughter or hilarity followed the assault upon the witness. Witness did not remember that Judge Goldthwaite or other counsel represented the State on the preliminary trial of this defendant. Witness was present at the preliminary trial of the defendant, but did not remember that the attorney representing the State denied the right of the defendant to compel the witness, by subpœna *duces tecum*, to produce the hat. Judge Goldthwaite had been the witness's attorney for many years.

Terry Smith was the next witness for the State. He testified that he saw Mr. Baker at the Benevolent Hall meeting a short while after the alleged assault upon him. When Baker sat down and removed his hat witness observed a rent in the hat on the front part and just behind the band. It ranged downward, and the hat was somewhat powder burned. Witness asked Baker the cause of the rent in his hat, and he replied that a man had shot at him.

Milton Baker testified, for the State, that at the time of the attempted assassination of W. R. Baker he, witness, lived in

the southern portion of the city of Houston.   He was not with Mr. Baker's party at the time of the attempted assassination; nor was he in the neighborhood of the Sabine street bridge at that time, nor did he witness the attempt to kill Mr. Baker.   He heard of the attempt some time after it occurred, and saw Mr. Baker on that night after the meeting at the Benevolent Hall broke up.   He saw Mr. Baker as that gentleman boarded the up town street car, but witness did not get on that car himself.   He knew nothing about the shooting except from hearsay.

George Hooper testified that he was with Milton Baker on the night of the attempted assassination of Mr. W. R. Baker, and corroborated Milton Baker's statement that he was not near the Sabine street bridge at the time of the attempted assassination.

Ed Williams testified, for the State, that he was not in Mr. W. R. Baker's crowd at the time of the attempted assassination, but was at the Benevolent Hall, and saw Mr. Baker and his party when they entered that hall after the shooting.   Witness heard the shots fired near the Sabine street bridge.

Ed Jemison testified, for the State, that he was with the Hon. W. R. Baker at the Sabine street bridge when the shots were fired at him on the night of March 23, 1886.   The party left the "So-so" saloon to attend the meeting then in progress at the Benevolent Hall.   At a point near the bridge a man on a gray horse galloped past the party and across the bridge without checking his speed.   Baker remarked that if he had that man before him he would fine him for galloping across the bridge.   No member of the party recognized the man.   When the party reached a point between fifty and a hundred yards beyond the bridge, a man on a large gray horse appeared on the opposite side of the street, and asked: "Is Mayor Baker in that crowd?" Mr. Baker stepped towards the man, and the man asked him to approach nearer.   Baker then went to the man, placed his hand on the horse's neck, and asked the man what he wanted.   The man replied: "I am a Smith man, and represent the Smith party.   I want you to withdraw in favor of Mr. Smith, and it will be all right; I will make it all right with you."   Baker replied to the effect that he would not withdraw from the race, when the man opened fire on him, firing three shots in rapid succession.   Two of the shots were fired after Mr. Baker, in stepping back, had fallen to his knees on the ground.   The man then fled, and witness and Love fired seven or eight shots at him.   Neither Milton Baker nor Ed Williams was in the Baker

crowd on that night, No one said: "Milton, let's play that trick." No one said: "Hold it up, Milton." No one said: "Hold it up higher, Milton." No one said: "Boys, you are not playing it right." No one said: "Some Smith man is trying to kill old man Baker." No laughter nor hilarity followed the shooting. Baker's party then went on to the Benevolent Hall, meeting Mr. Glass, and later met a party en route to investigate the cause of the shooting. Arriving at the Benevolent Hall, Mr. Baker took a seat near the speaker's stand, and it was then discovered that one of the balls fired at Baker had passed through his hat. Tankersly was speaking. After Tankersly's speech it was announced from the stand that somebody had shot at Baker, and the meeting broke up.

Wyat Davis, Henry Love and John Bentley, members of the Baker party who witnessed the shooting, testified, for the State, substantially as did the witness Jemison.

J. W. Temby testified, for the State, that early on the morning after the alleged shooting at Baker, the defendant told him of the shooting, giving in detail, substantially the same account that he afterwards embodied in his affidavit, except that he located the shooting near the Preston street bridge, which was three-quarters of a mile distant from the Sabine street bridge. Witness remarked that the reports of the affair located it near the Sabine street bridge. Defendant replied that the reports were in error, and that the shooting occurred as he said, near the Preston street bridge, and near Charley Ghering's saloon.

At this point the State read in evidence a part of defendant's affidavit, as follows: "On Tuesday night, March 23, 1886, I, in company with an Irishman called Pat, and two colored men named Milton Williams and Frank ———, went on towards Sabine bridge. About the middle of the bridge we fell in behind a party composed of Mayor Baker, a white man whose name I don't know, and several colored men, among them Ed Jemison, John Spriggins, Ed Williams, Milton Baker, and others I know by face but not by name. We followed on behind until the party in advance reached the other end of the bridge. Then they halted and some one said: "Milton, lets play that trick." Our party stopped by the magnolia tree near the other end of the bridge. Some one then said: "Hold it up, Milton." Milton then pulled Mr. Baker's hat off his head. Then a voice said: "Hold it up higher, Milton." Then Milton held the hat up in his left hand, and fired at it with his right. After the shot was

fired some one said: "Boys, you aint playing it right," and then they all commenced to cry out ·that some Smith man was trying to kill old man Baker." The State rested.

Mrs. Crosby was the first witness for the defense. She testified that she lived near the Sabine street bridge in the city of Houston, and heard the shots alleged to have been fired at the Hon. W. R. Baker, on the night of March 23, 1886. She went to her gallery, and heard loud laughter proceed from the direction of the bridge. As she was going into her house she saw a man on a gray horse ride rapidly by, and a few moments later she heard the loud laughter again, and concluded that a drunken crowd were firing off their pistols.

F. F. Chew, an attorney at law, testified, for the defense, that he was at the Benevolent Hall meeting at the time of the alleged assault on the Hon. W. R. Baker, and heard the firing of pistols in the direction of the Sabine street bridge. He saw Mr. Baker when he came into the Benevolent Hall, and examined his hat. The ball entered the hat just above the narrow band, and passed horizontally through it. The pistol from which that ball was fired was neither elevated nor depressed. Neither the hat nor Mr. Baker's face was powder burned. Witness knew something of powder burns, having been badly powder burned in the face on one occasion. The weapon from which witness was powder burned was discharged at a distance of about five feet from witness's face. A doctor afterwards extracted one hundred and twenty grains of powder from witness's face, and some of the grains were still in his face. From witness's experience he would say that if Mr. Baker's hat was on his head when the ball passed through it, it would inevitably have wounded Mr. Baker. Had the shooting occurred as detailed by the witnesses for the State, Mr. Baker's face and his hat would most inevitably have been badly powder burned.

Albert Spiller testified, for the defense, that on his return home from the business part of Houston, on the night of the alleged assault, he had to cross Sabine street bridge from south to north. Witness was riding a large iron gray horse, and rode in a brisk trot. Near the north end of the bridge witness met a party of five or six persons, walking. He did not recognize any of them, although he was acquainted with Judge Brashear. Shortly after he passed the party, witness heard several shots fired at the south end of the bridge, succeeded immediately by loud laughter. Witness turned his horse at once and rode back towards the

crowd. He knew that no one did, or could have passed him from the time he passed the party on the bridge until the shots were fired. Witness followed the party to the Benevolent Hall, where he learned that somebody had tried to assassinate the Hon. W. R. Baker. Witness saw no one else in the neighborhood, and was satisfied that the claim of attempted assassination referred to the shooting he had heard at the bridge. Up to that time witness had supported Baker, but instantly transferred his support to his opponent. Witness was satisfied that no attempt at assassination had been made, and went home. It was light enough on the bridge on that night to see a dog.

Henry C. Thompson testified, for the defense, that he was an expert in the use of fire arms, and knew that a pistol would powder burn at a distance of five feet. He made some experiments on the day of this trial, firing at pieces of paper at a distance of five feet, and against a strong wind. He found that the powder from the pistol would burn holes in the paper at that distance. He did not believe it possible for a man to be fired at under the conditions testified by the witnesses for the State in this case, and escape powder burn about the face, hair and hat. The "So-so" saloon was a low negro dive, frequented by depraved negro men and women.

S. S. Ashe testified, for the defense, that, on the morning after the alleged assault upon Baker, he heard of the defendant making substantially the same statement he has since embodied in the affidavit upon which this prosecution is predicated. He asked defendant about it, and defendant related it substantially as it is set out in the affidavit, except that he located it at the Preston street bridge. Witness called his attention to the reports that it occurred at the Sabine street bridge. Defendant replied that he did not know one street or bridge from another by name, but piloted the witness to the point where the shooting occurred, and showed the magnolia tree under which he stood when the hat was shot. He then piloted witness to the Sabine street bridge, where the State locates the shooting, pointed out the magnolia tree, and again related the circumstances of the affair substantially as they are embodied in the affidavit.

The defense closed.

Mr. Harrison testified, for the State, in rebuttal, that he was at a brick yard near the Sabine street bridge on the night of the alleged assault upon the Hon. W. R. Baker. He saw a man on a gray horse cross the bridge on that night, and, shortly after the shoot-

ing, recross it at a very rapid gait, and evidently in flight. No one passed the bridge, after the Baker party went over, for a long time. The first person to cross it after the shooting was a colored woman, going in an opposite direction from the Benevolent Hall.

Mr. Glazier testified, for the State, in rebuttal, that he kept a store near the north end of the Sabine street bridge. Witness heard the shots fired near the bridge, on the night of March 23, 1886, and shortly afterwards saw a horseman at full speed cross the bridge.

The facts as to the change of the venue appear in the first head note.

*H. S. Fisher, J. B. Stubbs, F. S. Burke* and *C. A. Jones,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. With regard to the rulings of the court in changing the venue of this cause, and upon the defendant's plea to the jurisdiction, it is unnecessary that we should notice them further than to refer to the decision of this court in Bohannon v. The State, 14 Texas Court of Appeals, 271, where precisely the same questions arose, and after an elaborate discussion were determined adversely to the positions urged by defendant's counsel in this case.

It was not error to permit the State's witness Railey to testify that he was a justice of the peace of Harris county, and as such administered to the defendant the oath upon which the false swearing is predicated. While the general rule is that the best evidence by which a fact can be proved must be produced, or its absence accounted for, before secondary or inferior evidence is admissible, a well established exception to this general rule is that the official character of an alleged public officer need not be proved by the commission or other written evidence of the right of such officer to act as such, except in an issue directly between the officer and the public. Such proof may be made originally by parol evidence, and is sufficient if it shows the person to be a de facto officer. This exception to the general rule is founded upon public convenience, and is as well established as is the general rule. (1 Greenl. Ev., secs. 83–92; Whart. Crim. Ev., sec. 164; 1 Whart. Ev., sec. 78; Abbott's Tr. Ev., p. 193.)

On the cross examination of the State's witness Jemison, the defendant asked said witness the question, "Have you not been confined in the penitentiary for crime?" Upon objection made thereto by the State, the witness was not permitted to answer the question; to which ruling of the court the defendant excepted. Defendant's bill of exception is very meagre. It does not disclose the purpose of the question, the objection made thereto, nor the answer expected to be elicited thereby. If it had shown that the defendant expected the question to be answered affirmatively, and that the object in eliciting such answer was to affect the credibility of the witness, we would hold that the court erred materially in refusing to permit the question to be answered. (Lights v. The State, 21 Texas Ct. App., 308.) As the matter is presented to us, however, we can not say that the ruling of the court was erroneous, or, if erroneous, that the error was prejudicial to the defendant.

There was no exception taken to the charge of the court, and but one special instruction was requested by the defendant, which was given. It is now, for the first time, urged that the charge is defective, in that it fails to instruct the jury in the legal signification of the words "deliberately" and "willfully," used in the statutory definition of this offense. In the respect complained of the charge is deficient. (Steber v. The State, 23 Texas Ct. App., 176, and cases there cited.) But, as the defect was not excepted to at the time of the trial, and as, in view of the facts of this case, such defect could not have reasonably caused injury to the rights of the defendant, especially when such defect was practically cured by the special instruction given at the request of the defendant, we must hold that the charge of the court is substantially sufficient.

We have given attention to all errors complained of, and have found no such error in the conviction as would warrant us in setting it aside; wherefore the judgment is affirmed.

*Affirmed.*

Opinion delivered November 2, 1887.